**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| | * | |
| WANDA GARNER. | | |
| 9309 Stuart lane | * | |
| Clinton , MD 20735 | | |
| | * | |
| Plaintiff, | | |
| | * | |
| v. | | Civil Action No. 1:25-cv-4024 |
| | * | |
| TRANSIT EMPLOYEES FEDERAL | | |
| CREDIT UNION | * | |
| 6404 Ivy Lane STE 510, | | |
| Greenbelt, MD 20770-1426 | * | |
| | | |
| Defendant. | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## <u>COMPLAINT</u>

Plaintiff Wanda Garner brings this action against Defendant Transit Employees Federal Credit Union, alleging violations of Title VII of the Civil Rights Act of 1964 and the District of Columbia Human Rights Act, and states as follows:

This is an action for employment discrimination and retaliation. Plaintiff was terminated after she refused to step down from her managerial position due to family caregiving responsibilities, creating a plausible inference of sex-based discrimination under Title VII. Additionally, Defendant directly discriminated against Plaintiff based on her family responsibilities in violation of the District of Columbia Human Rights Act.

## I.  JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over Plaintiff's Title VII claims pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f)(3).

2. This Court has supplemental jurisdiction over Plaintiff's District of Columbia Human Rights Act claims pursuant to 28 U.S.C. § 1367(a), as those claims form part of the same case or controversy as Plaintiff's federal claims.

3. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claims occurred in this judicial district. Specifically, Plaintiff worked at Defendant's Washington, D.C. branch location at 2440 Market Street, Suite 901, NE Washington, DC 20018, where all discriminatory and retaliatory conduct occurred.

## II.   EXHAUTION OF ADMINSTRATIVE REMEDIES

4. Plaintiff timely filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and received a Notice of Right to Sue dated September 4, 2025. This Complaint is filed within 90 days of Plaintiff's receipt of that Notice.

5. Plaintiff also filed a complaint with the D.C. Office of Human Rights, which has deferred to this action.

## III.   PARTIES

6. Plaintiff Wanda Garner is an individual residing at 9309 Stuart Lane, Clinton, Maryland 20735.

7. Defendant Transit Employees Federal Credit Union ("TEFCU") is a federal credit union with its principal place of business at 6404 Ivy Lane, Greenbelt, Maryland 20770.

8. Defendant operates a branch office in Washington, D.C. at 2440 Market Street, Suite 901, NE Washington, DC 20018.

9. At all relevant times, Defendant employed fifteen or more employees for each working day in each of twenty or more calendar weeks and was an employer engaged in an industry affecting commerce within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(b).

## IV.  FACTUAL ALLEGATIONS

### A. Plaintiff's Employment and Protected Characteristics

10. Plaintiff is a woman and a mother with family care responsibilities for her three-year-old son.

11. Plaintiff was hired by Defendant in April 2024 as Assistant Branch Manager at Defendant's Washington, D.C. branch.

12. Within one week of hire, the Branch Manager resigned abruptly and Plaintiff was promoted to Acting Branch Operations Manager.

13. Plaintiff worked at Defendant's Washington, D.C. branch location throughout her employment.

14. Despite severe understaffing and lack of training, Plaintiff consistently performed her duties satisfactorily, as evidenced by witness statements from former employees.

### B. March 7, 2025: The "Step Down" Demand Based on Family Emergency

15. On March 7, 2025, Plaintiff's three-year-old son experienced a medical emergency. He was vomiting repeatedly and unable to keep food down.

16. Despite the emergency, Plaintiff reported to work as scheduled at the severely understaffed D.C. branch.

17. At approximately 9:00 AM, Plaintiff notified her supervisor, Jennifer Le (Chief Administrative Officer), that she needed to leave by 1:00 PM to take her son to the emergency room.

18. Danielle McAllister (HR Manager) subsequently contacted Plaintiff and asked if she could stay until 3:00 PM instead.

19. Plaintiff explained that her three-year-old son was experiencing a medical emergency and she could not delay seeking medical care beyond 1:00 PM.

20. While Plaintiff was actively assisting members at the branch, she received additional calls from her son's sitter reporting that her son was gagging and had vomited again.

21. At approximately 1:20 PM on March 7, 2025, Plaintiff returned a call to Jennifer Le and Danielle McAllister, who were both on the line.

22. During this call, Jennifer Le and Danielle McAllister directly asked Plaintiff whether she wanted to "step down from [her] position or transition to part-time due to [her] need to leave for [her] son's emergency."

23. At the time of this conversation, Plaintiff was also temporarily caring for her eight-month-old niece and five-year-old nephew due to family circumstances, which was also referenced during the call.

24. Plaintiff responded by questioning why she would make a permanent employment change due to a temporary family emergency, emphasizing that she had no prior attendance issues and had never been reprimanded before.

25. Jennifer Le abruptly ended the call by stating, "Wanda, this conversation is over."

26. Immediately before Plaintiff left to take her son to the emergency room, Defendant issued her a written warning dated March 7, 2025, regarding previously discussed and resolved operational matters from a February 27, 2025 meeting.

27. The timing of this written warning—issued the same day as the family emergency and the "step down" demand—was pretextual and retaliatory.

## C. Escalating Retaliation Following Plaintiff's Refusal to Step Down

28. Following March 7, 2025, Plaintiff experienced escalating targeting and discipline, despite maintaining professional conduct and working extended hours to meet operational demands.

29. Plaintiff began experiencing severe work-related stress, documented by her healthcare provider, including migraine headaches requiring emergency room visits.

30. On May 19, 2025, Plaintiff's healthcare provider documented: "Since last seen, she was terminated by her employer. Actually as a result of this, she is feeling much better. The stress of her employment is no longer on her."

## D. April 16, 2025: Suspension for COVID-Related Childcare Emergency

31. On April 16, 2025, at approximately 7:38 AM, Plaintiff received a text message from her son's daycare provider stating: "Good morning Wanda I apologize I am going to have to close the center for today and for the rest of the week I wasn't feeling well so I took a Covid test this morning and it is positive."

32. Plaintiff immediately contacted Jennifer Le and Danielle McAllister via text message at approximately 7:48-8:00 AM, forwarded the daycare provider's COVID-positive notification, and offered a solution: "Is it okay for me to bring him to work with me? He can stay in my office out of members sight."

33. Danielle McAllister responded: "No you won't be able to bring him to work. Also we can't put the rest of the staff at risk if there's concern of a positive Covid test."

34. Plaintiff acknowledged and apologized for the unavoidable absence.

35. Plaintiff was already approved for leave on April 17-18, 2025 (her birthday).

36. Despite offering a solution, having no control over the COVID exposure, and having pre-approved leave immediately following, Defendant issued Plaintiff a six-day unpaid suspension on April 16, 2025, for the single COVID-related absence.

37. The suspension notice stated this was Plaintiff's "final warning" and threatened termination for any further attendance issues.

38. Cloe Allen received no written warnings, no suspensions, and no disciplinary action for these absences.

39. Plaintiff submitted a detailed written response on April 28, 2025, explaining the unavoidable nature of the COVID absence and the disparate treatment compared to other employees.

## E. Denied Leave Requests and Continued Retaliation

40. After Plaintiff responded to the March 7 warning and April 16 suspension, Defendant began denying her leave requests, even when she had sufficient accrued paid time off.

41. On April 9, 2025, Plaintiff requested leave for May 27-30, 2025, citing "MENTAL BREAK VACATION" due to work-related stress.

42. On April 15, 2025, Jennifer Le denied the leave request, stating: "LWOP will not be authorized; please resubmit with PTO."

43. At the time, Plaintiff had only 4.03 hours of PTO available, making it impossible to take the requested mental health leave.

44. On May 5, 2025, Plaintiff requested leave for May 22, 2025, to attend a great uncle's memorial service in South Carolina.

45. Jennifer Le denied this request on May 5, 2025, despite Plaintiff having PTO available and the leave being for a family funeral.

## F. May 16, 2025: Pretextual Termination

46. On May 16, 2025, while Plaintiff was working at the D.C. branch, she received a phone call from Danielle McAllister requesting that she report to Defendant's Greenbelt, Maryland headquarters to discuss her annual performance review.

47. Upon arrival at the Greenbelt office, Plaintiff was immediately handed an "indefinite suspension" letter (effectively a termination) from Jennifer Le and Danielle McAllister.

48. No performance review was conducted. Plaintiff never had an opportunity to discuss her concerns regarding training, her job performance, or branch operations.

49. The termination letter dated May 16, 2025, contained numerous pretextual and false accusations, including:

- Failure to communicate about WMATA payroll issues (despite Plaintiff having documented this issue in January 2025 as instructed by management)

- Inadequate management of service events and member services (despite severe understaffing beyond Plaintiff's control)

- Attendance issues (despite all leave being pre-approved and Plaintiff having better attendance than employee Cloe Allen, who faced no discipline)

50. Plaintiff had, in fact, properly documented the WMATA payroll issue in the branch OneNote on February 19, 2025, exactly as CEO Rita Smith had instructed.

51. Plaintiff had also directly contacted Ron (Accounting Manager), Gloria Hernandez (former Branch Manager), and Annette Davis about the WMATA issue in January 2025, but none could provide a solution.

52. The stated reasons for termination were demonstrably pretextual given the evidence of Plaintiff's diligent work performance and the contemporaneous documentation.

## G. Post-Termination Evidence of Consciousness of Wrongdoing

53. On June 12, 2025, the D.C. Department of Employment Services approved Plaintiff's unemployment claim, determining that "the employer failed to provide evidence that the claimant failed to successfully perform his/her job duties."

54. One day later, on June 13, 2025—the day after unemployment approval— Defendant sent Plaintiff a Separation Agreement and Release offering severance pay of $2,884.62 in exchange for releasing all claims.

55. Plaintiff declined to sign the separation agreement.

56. Defendant's post-termination offer of severance immediately after losing the unemployment claim demonstrates consciousness of wrongful conduct.

## H. Witness Corroboration and Pattern of Discriminatory Conduct

57. Multiple former employees provided written statements corroborating Plaintiff's account and describing Defendant's hostile, discriminatory work environment:

58. **Nicole McCray** (former Member Service Representative, worked January-December 2024) stated: "Ms. Garner brought several issues to upper management's attention... These issues were never properly handled. Instead, they forced her to figure it out on her own as a new hire... Ms.

Garner was under a lot of stress, which caused severe headaches and constant pain... The way she was treated-and ultimately fired-was not okay."

59. **Tiera Wright** (Chief Branch Operations, worked November 2024-June 2025) stated: "In my professional opinion, Wanda was subjected to disparate and unfair treatment compared to other employees in similar roles. The corporate leadership appeared intent on building a case against her rather than supporting her success."

60. Tiera Wright further documented: "Eventually, Wanda received a four-page disciplinary notice containing numerous exaggerated claims. Soon after, another employee Dijetta Jones who had recently joined as a Member Service Representative was elevated to Branch Manager immediately following Wanda's 'indefinite suspension'... Unlike Wanda, this new manager was not required to meet the same performance metrics, was given greater leniency regarding member interactions, and was permitted to conduct interviews-privileges that had been explicitly withheld from Wanda."

61. **Lanice Mills** (Loan Officer, worked June 2024-February 2025) stated: "My direct manager was Wanda Garner. She did an amazing job with supporting and encouraging us during our hectic days. She received little to no support from upper management as she tried her best to keep the company flowing and keep the members happy... I observed first hand how Upper management always gave her a hard way to go. It seemed like they criticized everything that she did and all of her efforts."

62. **Jasmine Parker** (Senior Branch Operations Specialist) stated: "Mrs. Garner frequently mentioned experiencing severe headaches brought on by stress and pressure to meet demands without the proper tools or adequate team support... From the beginning of their role, Mrs. Garner was expected to perform without receiving comprehensive instruction."

63. During Plaintiff's one-year tenure (April 2024-May 2025), approximately 23 employees left Defendant's organization, reflecting systemic management problems.

## I. Sex-Based Stereotyping and Differential Treatment

64. The March 7, 2025 demand that Plaintiff "step down" or transition to part-time due to her need to care for her sick child reflects sex-based stereotyping about women's roles as caregivers.

65. Defendant's actions were motivated by assumptions that, as a mother, Plaintiff should prioritize childcare over her career and should accept demotion or reduced hours when family emergencies arise.

66. Defendant's immediate issuance of discipline on March 7, 2025—the same day as the family emergency—demonstrates animus toward Plaintiff for asserting her right to care for her child without sacrificing her career.

67. Defendant subjected Plaintiff to heightened scrutiny, unrealistic performance expectations, and escalating discipline following her refusal to step down from her managerial position due to family responsibilities.

68. The temporal proximity between Plaintiff's rejection of the "step down" demand and the escalating discipline (March 7 warning → April 16 suspension → May 16 termination) establishes a causal connection between Plaintiff's protected opposition and the adverse employment actions.

## V.  CLAIMS FOR RELIEF

### A.  COUNT I: SEX DISCRIMINATION IN VIOLATION OF TITLE VII

*(42.S.C. § 2000e et seq.)*

69. Plaintiff realleges and incorporates by reference paragraphs 1-68.

70. Defendant discriminated against Plaintiff on the basis of sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1).

71. Defendant subjected Plaintiff to adverse employment actions—including demands to step down from her position, written warnings, suspension, and termination—because of sex-based stereotypes regarding women's roles as mothers and caregivers.

72. Defendant's conduct was motivated by the assumption that, as a working mother, Plaintiff should subordinate her career to family caregiving responsibilities and accept demotion or part-time status when faced with family emergencies.

73. Defendant treated Plaintiff less favorably than similarly situated employees without caregiving responsibilities, as evidenced by the disparate treatment of employee Cloe Allen, who had multiple absences without discipline.

74. The temporal proximity of adverse actions following Plaintiff's family emergencies and her refusal to step down establishes that Defendant's actions were motivated by sex-based animus.

75. But-for Plaintiff's sex and Defendant's sex-based stereotypes about working mothers, Plaintiff would not have been asked to step down from her position, subjected to escalating discipline, or terminated.

76. As a direct and proximate result of Defendant's unlawful sex discrimination, Plaintiff has suffered damages including:

- Lost wages and benefits

- Loss of career advancement opportunities

- Severe emotional distress, anxiety, and stress-related medical conditions

- Damage to professional reputation

- Other compensable injuries

## B. COUNT II: RETALIATION IN VIOLATION OF TITLE VII

*(42.S.C. § 2000e-3(a))*

77. Plaintiff realleges and incorporates by reference paragraphs 1-76.

78. Plaintiff engaged in protected activity under Title VII by opposing discriminatory practices, specifically by:

- Refusing the March 7, 2025 demand to step down or transition to part-time due to family caregiving (opposing sex-based stereotyping)

- Responding in writing to the pretextual March 7 written warning

- Responding in writing to the pretextual April 16 suspension

- Asserting her right to equal treatment despite her status as a working mother

79. Defendant knew or reasonably should have known that Plaintiff's refusal to accept demotion based on family caregiving constituted opposition to sex discrimination.

80. Following Plaintiff's protected opposition, Defendant subjected her to a pattern of escalating adverse employment actions:

   - March 7, 2025: Written warning issued same day as protected opposition
   - April 16, 2025: Six-day unpaid suspension for single COVID-related absence
   - Denial of leave requests in April-May 2025
   - May 16, 2025: Termination under false pretenses

81. The close temporal proximity between each instance of protected activity and subsequent adverse action establishes a causal connection.

82. Defendant's stated reasons for the adverse actions were pretextual, as evidenced by:

   - Defendant's inability to prove performance deficiencies in unemployment proceedings
   - Post-termination severance offer one day after losing unemployment claim
   - Witness testimony regarding Plaintiff's satisfactory performance
   - Disparate treatment compared to employee Cloe Allen

83. But-for Plaintiff's protected opposition to sex discrimination, she would not have been subjected to escalating discipline and termination.

84. As a direct and proximate result of Defendant's retaliation, Plaintiff has suffered damages.

## C. COUNT III: FAMILY LEAVE DISCRIMINATION IN VIOLATION OF THE D.C. FAMILY AND MEDICAL LEAVE ACT *(D.C. Code §32-502)*

85. Plaintiff realleges and incorporates by reference paragraphs 1-84.

86. The D.C. Family and Medical Leave Act (DCFMLA) applies to this action because Plaintiff performed all of her work at Defendant's Washington, D.C. branch office located at 2440 Market Street, Suite 901, NE Washington, DC 20018.

87. The DCFMLA entitles an employe to a total of "16 workweeks of family leave during any 24-month period for…. The care of a family member of the employee who has a serious health condition." D.C. Code § 32-502 (a)(4).

88. Plaintiff is entitled to family leave as she worked for Defendant for more than a year, prior to her request for time off to take care of her son.

89. Plaintiff requested off to take care her family member, her three-year old son, who was suffering from a serious health condition that needed emergency care, and was later close contact with COVID.

90. On March 7, 2025, Defendant directly discriminated against Plaintiff and denied her entitlement to DCFMLA by asking her to "step down from [her]

position or transition to part-time due to [her] need to leave for [her] son's emergency."

91. Defendant subjected Plaintiff to adverse employment actions—including demotion demands, written warnings, suspension, denied leave, and termination—denying Plaintiff her 16 workweeks of family leave to care for a family member of the employee how has a serious health condition.

92. But-for Plaintiff's request to care for her family and her exercise of those requests, Defendant would not have demanded she step down, subjected her to discipline, or terminated her employment.

93. As a direct and proximate result of Defendant's violation of the DCFMLA, Plaintiff has suffered damages.

## D. COUNT VI: FAMILY RESPONSIBILITIES DISCRIMINATION IN VIOLATION OF THE D.C. HUMAN RIGHTS ACT

*(D.C. Code § 2-1402.11)*

86. Plaintiff realleges and incorporates by reference paragraphs 1-93.

87. The D.C. Human Rights Act ("DCHRA") applies to this action because Plaintiff performed all of her work at Defendant's Washington, D.C. branch office located at 2440 Market Street, Suite 901, NE Washington, DC 20018.

88. The DCHRA prohibits employment discrimination based on "family responsibilities," defined as "the state of being, or the potential to become, a contributor to the support of a person or persons in a dependent relationship." D.C. Code § 2-1401.02(12A).

89. Plaintiff has "family responsibilities" within the meaning of the DCHRA as the mother and primary caregiver of her three-year-old son and, at relevant times, as a caregiver for her infant niece and young nephew.

90. On March 7, 2025, Defendant directly discriminated against Plaintiff based on her family responsibilities by asking her to "step down from [her] position or transition to part-time due to [her] need to leave for [her] son's emergency."

91. Defendant subjected Plaintiff to adverse employment actions—including demotion demands, written warnings, suspension, denied leave, and termination—because of her family caregiving responsibilities.

92. Defendant's discriminatory conduct was motivated by Plaintiff's status as a working mother with family care responsibilities and her exercise of those responsibilities by attending to her son's medical emergencies.

93. But-for Plaintiff's family responsibilities and her exercise of those responsibilities, Defendant would not have demanded she step down, subjected her to discipline, or terminated her employment.

94. As a direct and proximate result of Defendant's violation of the DCHRA, Plaintiff has suffered damages.

## E. COUNT V: RETALIATION IN VIOLATION OF THE D.C. HUMAN RIGHTS ACT

*(D.C. Code § 2-1402.61)*

95. Plaintiff realleges and incorporates by reference paragraphs 1-94.

96. Plaintiff engaged in protected activity under the DCHRA by:

- Opposing discrimination based on family responsibilities

- Refusing to step down or accept part-time status due to family caregiving

- Asserting her right to equal treatment despite her family responsibilities

- Responding in writing to pretextual disciplinary actions

97. Defendant knew that Plaintiff was opposing discrimination prohibited by the DCHRA.

98. Following Plaintiff's protected activity, Defendant subjected her to escalating adverse employment actions culminating in termination.

99. The temporal proximity and pretextual nature of these actions establish a causal connection between the protected activity and the adverse employment actions.

But-for Plaintiff's opposition to family responsibilities discrimination, Defendant would not have subjected her to escalating discipline and termination.

100.     As a direct and proximate result of Defendant's retaliation in violation of the DCHRA, Plaintiff has suffered damages.

## VI.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff Wanda Garner respectfully requests that this Court enter judgment in her favor and against Defendant as follows:

A. **Declaratory Relief**: Declare that Defendant's conduct violated Title VII of the Civil Rights Act of 1964 and the District of Columbia Human Rights Act;

B. **Reinstatement or Front Pay**: Order Defendant to reinstate Plaintiff to her former position as Acting Branch Operations Manager or a substantially equivalent position, or in the alternative, award front pay;

C. **Back Pay**: Award Plaintiff all back pay, benefits, and other compensation from the date of her termination (May 16, 2025) to the date of judgment, plus prejudgment interest;

D. **Compensatory Damages**: Award Plaintiff compensatory damages for emotional distress, mental anguish, physical manifestations of stress (including migraine headaches and emergency room visits), humiliation, damage to professional reputation, and other non-pecuniary losses in an amount to be determined at trial;

E. **Punitive Damages**: Award Plaintiff punitive damages in an amount sufficient to punish Defendant and deter future discriminatory and retaliatory conduct;

F. **Attorney's Fees and Costs**: Award Plaintiff reasonable attorney's fees, expert witness fees, costs, and expenses pursuant to 42 U.S.C. § 1988 and D.C. Code § 2-1403.16(a);

G. **Pre-Judgment and Post-Judgment Interest**: Award pre-judgment and post-judgment interest at the applicable legal rate;

H. **Such Other Relief**: Grant such other and further relief as this Court deems just, proper, and equitable.

## VII.  JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims and issues so triable.


Dated: 11/18/25

Respectfully Submitted,

QUINN PATTON LC

/s/ Donald Quinn
Donald Quinn, Fed. Bar No. 1738652
Quinn Patton, LC
838 Ritchie Highway, Suite 4
Severna Park, Maryland 21146
(443)247-5444 / (202) 508-3644
donquinn@quinnpatton.com
*Attorney for the Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of November 2025, the foregoing was served by private process server and by U.S. Mail, Registered Mail with Restricted Delivery, addressed to the recipients at their respective service locations, including

Transit Employees Federal Credit Union
2440 Market Street, Suite 901, NE,
Washington, DC 20018
*Defendant*

and

Transit Employees Federal Credit Union
6404 Ivy Lane, Suite 510,
Greenbelt, MD 20770.
*Defendant*

/s/ Donald Quinn

Donald G. Quinn